**VIGO COUNTY REPUBLICAN CENTRAL COMMITTEE, Jeff Junkens, Emily Junkens, David Lohr, Linda Lohr, James C. May, and Deborah May, Plaintiffs,**

v.

**VIGO COUNTY COMMISSIONERS, Defendant.**

No. TH 93-54-C.

United States District Court,
S.D. Indiana,
Terre Haute Division.

Oct. 15, 1993.

James Bopp, Jr. and Richard E. Coleson, Bopp Coleson & Bostrom, Terre Haute, IN, for plaintiffs.

Robert L. Wright, Wright Shagley & Lowery, Terre Haute, IN, for defendant.

## ENTRY FOLLOWING TRIAL

TINDER, District Judge.

The United States Constitution and various laws of the State of Indiana seek to insure that each person's vote has equal weight. Unfortunately, this noble and democratic concept is often strained in practice. This case illustrates how the reality of political pragmatism, if unchecked, can endanger this fundamental concept of equality. This court treads carefully into this arena, given the principles of federalism and the separation of powers on which our republican form of government is founded. Nonetheless, this court must adjudicate the case and controversy before it. If this court failed to act, some of the voters of Vigo County, Indiana would be in danger of losing the equality of voting promised to them by law.

## FINDINGS OF FACT [1]

The County Council of Vigo County, Indiana consists of seven members, three of whom are elected at large and four of whom are elected from single-member districts. In 1974, the Vigo County Commissioners (the Commissioners) adopted an ordinance creating four County Council districts (the 1974 Plan).[2]

The Plaintiffs are six registered voters residing in Vigo County and a political organization which has sponsored candidates for election to the Vigo County Council in the past, and which intends to sponsor such candidates in the 1994 election.

The Commissioners did not attempt to redistrict Vigo County [3] until after the Plaintiffs filed this lawsuit alleging that the 1974 Plan violated the Equal Protection Clause of the Fourteenth Amendment. Specifically, the Plaintiffs contended that the 1974 Plan

---

1. If any finding of fact is more appropriately a conclusion of law, or if any conclusion of law is more appropriately a finding of fact, or if there are mixed findings and conclusions, they should be considered as what they are, rather than what they are labeled.

2. The ordinance is codified under Vigo County Code § 1–3–3.

3. Indiana Code § 36–2–3–4(e) and Vigo County Code § 1–3–3 required the Commissioners to redistrict the County Council districts in 1981. However, the Commissioners failed to do so. On August 15, 1983, the Commissioners recodified the County Council districts as set forth in the 1974 Plan. Indiana Code § 36–2–3–4(e) and Vigo County Code § 1–3–3 also required the Commissioners to redistrict in 1991. Again, however, the Commissioners declined to do so.

was unconstitutional because it contained an excessive population deviation.

Based upon the 1990 census, the population of Vigo County is 106,107. Therefore, the ideal population[4] for each of the four County Council districts is 26,527. When the Plaintiffs filed this action, the population of the four county council districts under the 1974 Plan and based upon 1990 census data was:

| District 1 | 28,613 |
| District 2 | 25,289 |
| District 3 | 21,502 |
| District 4 | 30,703 |

Based upon these population figures, the 1974 Plan represents approximately a 37% total deviation[5] from the 26,527 ideal-population figure.[6]

In response to the Plaintiffs' lawsuit, the Commissioners admitted[7] that the 1974 Plan violated the Equal Protection Clause, and redistricted Vigo County on June 21, 1993 (the June 21 Plan). The June 21 Plan reflects the Commissioners' first effort to redistrict Vigo County since 1974. The June 21 Plan was codified under Vigo County Ordinance No. 93–1–3–3, and contained a total population deviation of 8.41%. The Commissioners achieved the results in this Plan by employing John Hanley, who had been involved in drawing the boundaries for elections in Terre Haute and Vigo County since approximately 1940. The Commissioners directed Hanley simply to reduce the popula-

tion deviation below 10%. That was the only criterion Hanley received.

The Plaintiffs responded to the June 21 Plan by amending their complaint, alleging that the June 21 Plan violated the Equal Protection Clause because the Commissioners did not make a good faith effort to create districts with the smallest population deviation possible. The Plaintiffs' amended complaint also contained a state-law claim, alleging that the Commissioners violated Indiana Code § 36–2–3–4(a) and (d), which require that counties be divided into four contiguous, single-member districts that (1) are compact, subject only to natural boundary lines; (2) do not cross precinct boundary lines; (3) contain, as nearly as possible, equal population; and (4) include whole townships, except when a division is necessary for redistricting.

Responding to the amended complaint, the Commissioners went back to Hanley and directed him to try to get the deviation lower. Hanley went back to his data and eventually got the deviation down to 3.8%. Subsequently, the Commissioners adopted a revised version of Ordinance No. 93–1–3–3 on August 23, 1993 (the August 23 Plan) based on Hanley's revisions, resulting in a total population deviation of 927, or 3.8%.

The Plaintiffs have presented a redistricting plan for the Vigo County Council districts (the Plaintiffs' Plan), reflecting a total population deviation of 109, or .41%. The division of the districts is set out in Plaintiffs' trial Exhibit 11 as follows:

---

4. The term "ideal population" means the average population of the four districts if they are constituted as equally in population as possible. "Ideal Population" is not to be confused with the term "Ideal Plan" or "More Ideal Plan" that the Plaintiffs used in their briefs and at trial to describe their plan. For clarity, the Plaintiffs' plan will be referred to herein simply as the "Plaintiffs' Plan."

5. "Total deviation" is determined by adding the deviation of the district with the largest population to the deviation of the district with the smallest population. "Average deviation" is determined by averaging the deviation of all the districts. *Farnum v. Burns*, 561 F.Supp. 83, 87 n. 5 (D.R.I.1983).

6. The court notes that the population data used by the Commissioners differs from the Census figures. However, the differences did little or

nothing to alter the rankings of the plans. Unfortunately, the Defendants failed to authenticate the source of the figures they used and failed to adequately explain the minor differences. On the other hand, the Plaintiffs' expert witness, Norman Primus, identified his data as originating from the Census Bureau of the United States. Accordingly, the court uses the Plaintiffs' data in this entry, and notes that the minor differences between the parties data are inconsequential.

7. The Commissioners first admitted this in their May 18, 1993 motion to continue the preliminary injunction hearing. Throughout the litigation, the Commissioners did not contest the Plaintiffs' contention that the 1974 Plan violated the Equal Protection Clause.

DISTRICT 1
  NEVINS TOWNSHIP
  LOST CREEK TOWNSHIP
  OTTER CREEK TOWNSHIP
  HARRISON TOWNSHIP PRECINCTS

| | |
|---|---|
| 6–A | 6–E |
| 6–B | 7–I |
| 6–C | 7–J |
| 6–D | |

DISTRICT 2
  FAYETTE TOWNSHIP
  SUGAR CREEK TOWNSHIP
  HARRISON TOWNSHIP PRECINCTS

| | | |
|---|---|---|
| 1–A | 1–H | 5–C |
| 1–C | 2–C | 5–D |
| 1–D | 2–E | 5–H |
| 1–F | 5–A | 5–I |
| 1–G | 5–B | |

DISTRICT 3
  HARRISON TOWNSHIP PRECINCTS

| | | | | |
|---|---|---|---|---|
| 2–B | 3–G | 4–B | 7–A | 7–G |
| 2–F | 3–H | 4–D | 7–B | 7–K |
| 3–B | 3–I | 4–F | 7–C | 8–A |
| 3–C | 3–J | 4–G | 7–D | 8–B |
| 3–E | 3–K | 5–G | 7–E | 8–C |
| 3–F | 4–A | 6–F | 7–F | 8–H |

DISTRICT 4
  RILEY TOWNSHIP
  PIERSON TOWNSHIP
  HONEY CREEK TOWNSHIP
  LINTON TOWNSHIP
  PRAIRIETON TOWNSHIP
  PRAIRIE CREEK TOWNSHIP
  HARRISON TOWNSHIP PRECINCTS

| | |
|---|---|
| 2–H | 8–E |
| 2–I | 8–F |
| 2–J | 8–I |
| 8–D | |

The hearing on the request for a Preliminary Injunction was combined with the trial on the merits. The trial was held on August 27, 1993.

## CONCLUSIONS OF LAW

### I. JURISDICTION

#### A. Jurisdiction Over Federal Constitutional Claim

This court has jurisdiction over the Plaintiffs' federal constitutional claim under Article III, section 2 of the United States Constitution and under 42 U.S.C. § 1983, 28 U.S.C. § 1331, and 28 U.S.C. § 1343(a)(3)–(4).

8. 28 U.S.C. § 1367 governs supplemental jurisdiction, and provides in pertinent part:
  (a) Except as provided in sub-sections (b) and (c) or as expressly provided otherwise by the Federal statute, in any civil action where the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution....

### B. Supplemental Jurisdiction Over State–Law Claim

■ This court has supplemental jurisdiction over the Plaintiffs' state claim under 28 U.S.C. § 1367.[8]

The Plaintiffs' federal and state claims involve a common nucleus of operative facts. Indiana law requires that a lawful redistricting plan be in place by December 31, 1993 in preparation for the upcoming County Council district elections which will take place in November 1994. Ind.Code § 36–2–3–4(f) (Burns Supp.1993). Therefore, it is in the interests of judicial economy, convenience, and fairness for this court to exercise its discretionary supplemental jurisdiction over the Plaintiffs' state-law claim. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). The Commissioners do not challenge the Plaintiffs' standing to bring this action.

## II. CONSTITUTIONAL CLAIM

### A. The Equal Protection Clause Requires Voting Districts to be as Close in Population as Possible.

■ The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution requires "substantial equality of population among the various districts, so that a vote of any citizen is approximately equal in weight to that of any other citizen...." *Reynolds v. Sims,* 377 U.S. 533, 579, 84 S.Ct. 1362, 1390, 12 L.Ed.2d 506 (1964). To comport with the principles of equal protection, a state or local governmental entity must make "an honest and good-faith effort to construct its districts 'as nearly of equal population as is practicable,' but ... absolute equality [is] a 'practical impossibili-

  (c) The district courts may decline to exercise supplemental jurisdiction over a claim under sub-section (a) if—
  (1) The claim raises a novel or complex issue of State law,

        *     *     *     *     *     *

  (3) The district court has dismissed all claims over which it has original jurisdiction,....
28 U.S.C.A. § 1367 (West 1976).

ty.'" *Gaffney v. Cummings,* 412 U.S. 735, 743, 93 S.Ct. 2321, 2326, 37 L.Ed.2d 298 (1973); *see also, Mahan v. Howell,* 410 U.S. 315, 324–25, 93 S.Ct. 979, 985, 35 L.Ed.2d 320 (1973). Deviations from the equal-protection principle are permissible if such deviations are justified by legitimate state interests:

> So long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-protection principle are constitutionally permissible....

*Reynolds,* 377 U.S. at 579, 84 S.Ct. at 1391.

■ In determining whether deviations are legitimate, courts essentially follow a four-step analysis. *Brown v. Thomson,* 462 U.S. 835, 852, 103 S.Ct. 2690, 2701, 77 L.Ed.2d 214 (1983) (Brennan, J., dissenting, joined by White, Marshall, and Blackmun, JJ.). First, the plaintiff must show that the population deviation is greater than 10%.[9] Secondly, the court considers whether the defendant's justifications for the deviation further legitimate state interests, and are not arbitrary or discriminatory. Thirdly, the defendant must show that any deviation from equality is no greater than necessary to serve the asserted state interests. Finally, the court considers whether the deviation is tolerable in light of the goal of substantial population equality.[10] *Id.*

### B. *Four–Step Analysis*

#### 1. Prima Facie Case of Discrimination Shown When Total Deviation Exceeds 10% ("Threshold Test").

When the Plaintiffs filed their lawsuit, the districting plan that was in effect (the 1974 Plan) had a population deviation of approximately 37%. The Commissioners reacted to the Plaintiffs' law suit by passing the June 21 Plan which lowered the maximum deviation to under 10%. After the Plaintiffs attacked the June 21 Plan, the Commissioners adopted the August 23 Plan which brought the deviation down to 3.8%. The Commissioners argue that the court should approve the August 23 Plan, at least for purposes of federal constitutionality under the Equal Protection Clause, because it is within the 10% de minimis threshold.

■ If a state or local unit of government makes a *good faith* effort to comply with federal and state redistricting laws, any plan with a population deviation of less than 10% is presumed to be constitutional. *Brown,* 462 U.S. at 842, 103 S.Ct. at 2695. Notably, the Commissioners did not redistrict until they were forced to do so by this lawsuit. Had the Commissioners' 1974 Plan been within the 10% de minimis threshold when the Plaintiffs' filed suit, the court would not have found, without more, a presumption of violation of the Equal Protection Clause. However, the threshold test does not apply when a case is already in court precisely because the reapportionment plan at issue was far beyond the de minimis threshold. *See Connor v. Finch,* 431 U.S. 407, 414–18, 97 S.Ct. 1828, 1833–35, 52 L.Ed.2d 465 (1977). In other words, because the court is engaged in active scrutiny of the Commissioners' plan pursuant to an ongoing lawsuit, the Commissioners may not simply draw up a revised plan with less than a 10% deviation and expect to be exempted from explaining why a plan with a lower deviation was not adopted.

The August 23 plan does not reflect a good faith effort to redistrict according to the criteria mandated by federal constitutional and state statutory law because the Commissioners made no effort to draw the districts as

---

9. "We have come to establish a rough threshold of 10% maximum deviation from equality (adding together the deviations from average district size of the most underrepresented and most overrepresented districts); below that level, deviations will ordinarily be considered *de minimis.*" *Brown,* 462 U.S. at 852, 103 S.Ct. at 2701.

10. The Seventh Circuit has summarized this analysis as follows:

> Initially, plaintiffs bear the burden of proving that the deviation from population equality is substantial. Once plaintiffs prove a prima facie case of discrimination, the burden shifts to defendants to show either that the deviation is unavoidable, or that the deviation is justified by an attempt to effectuate a rational state policy.

*Sutton v. Dunne,* 681 F.2d 484, 486–87 (7th Cir. 1982) (citations omitted), *cert. denied,* 460 U.S. 1081, 103 S.Ct. 1768, 76 L.Ed.2d 342 (1983).

equal in population as possible. As evidenced by the trial testimony of John Hanley,[11] the impetus behind the June 21 Plan was simply to move precincts between districts until the population deviation was less than 10% and then stop, despite the fact that it was possible to achieve districts with a significantly lower population deviation. This is not a good faith effort to make the population as equal as possible. It is, at best, a minimal effort to avoid the consequences of this suit. The evidence does not support a conclusion that the Commissioners made a sincere effort to attain reasonably equal districts, even after their constitutional obligation to do so was put directly to them by this suit. Simply stated, governmental entities may not disregard population equality when constructing districts and then ease barely into compliance with the 10% de minimis threshold only if they are sued.

Because the population deviation existing when the Plaintiffs filed suit exceeded 10%, because the Commissioners ignored the redistricting required by law in 1981, and because their initial efforts to mitigate the deviation appears to have been an effort to dodge this suit rather than to fulfill their constitutional obligation, the court concludes that the Plaintiffs made out a prima facie case of discrimination.

### 2. The Commissioners' Reasons for the Deviations Must Further Legitimate State Interests.

■ After a plaintiff shows that the deviation at issue is sufficiently large to make out a prima facie case of discrimination, the court considers the quality of the reasons advanced by the governmental entity to explain the deviation. "[D]eviations from population equality must be justified by legitimate state interests." *Abate v. Mundt,* 403 U.S. 182, 185, 91 S.Ct. 1904, 1906, 29 L.Ed.2d 399

(1971). Here, the legitimate state interests are codified. The court must determine whether the August 23 Plan's deviation[12] from total population equality is justified by any of the following state interests: Keeping districts contiguous, keeping them compact, following natural boundaries, not crossing precinct lines, and including whole townships. Ind.Code § 36-2-3-4 (Burns Supp.1993).

The Commissioners offered no explanation for the deviation. Consequently, the court has no basis upon which to approve the August 23 Plan containing a higher deviation than the Plaintiffs' Plan. Indeed, it is unlikely that such justification exists because the Plaintiffs' Plan is more contiguous, more compact, and more respectful of natural boundaries.

### 3. The Commissioners Must Show that the Deviation From Equality Is No Greater than Necessary to Serve Legitimate State Interests.

Even assuming that the Commissioners justified the deviation by legitimate state interests, they must further show that such deviation is not greater than is necessary to serve such state interests. However, they cannot make such a showing if the Plaintiffs' Plan contains a smaller deviation and serves those state interests substantially as well. "[I]f another plan could serve that policy substantially as well while providing smaller deviations from equality, it can hardly be said that the deviations advance the policy." *Brown,* 462 U.S. at 852, 103 S.Ct. at 2701. The Plaintiffs' Plan contains less deviation than any of the Commissioners' proposed plans. Specifically, the Commissioners' August 23 Plan has a 3.8% deviation, while the Plaintiffs' Plan has a .41% deviation.

In sum, the August 23 Plan violates the Equal Protection Clause of the Fourteenth Amendment because the Commissioners did

---

**11.** It should be noted that this court intends no criticism of Mr. Hanley, a native of Vigo County since his birth in 1912. He is a bright and diligent man who carries in his head a wealth of historical knowledge regarding the political and geographic boundaries of that county. He performed his duties on this matter exactly as he was directed by the Commissioners. The court has no doubt that Mr. Hanley could have reached the same level of equality among the districts as

the Plaintiffs' Plan if he had been assigned that mission. Most remarkably, Mr. Hanley performed his work with only the benefit of a pencil, a note pad, and a few maps—no high-tech computers were necessary for him.

**12.** That is, the 3.8% deviation remaining after Mr. Hanley's second effort.

not make a good faith effort to create districts as equal in population as possible, and the population deviation in the Commissioners' August 23 Plan is not justified by any legitimate state interest. Not only is the Plaintiffs' plan lower in population deviation than the August 23 Plan, it more closely conforms to the asserted state interests set forth in Indiana Code § 36–2–3–4. Accordingly, judgment will be entered for the Plaintiffs on Count I of their amended complaint.

## III. INDIANA'S REDISTRICTING STATUTE

Indiana law required the Commissioners to "divide the county into four (4) *contiguous,* single member districts that comply with subsection (d) . . . ." Ind.Code. § 36–2–3–4(a) (Burns Supp.1993). Indiana law further required that single-member districts must:

(1) Be *compact,* subject only to *natural boundary lines* (such as railroads, major highways, rivers, creeks, parks, and major industrial complexes);

(2) Not cross *precinct boundary* lines;

(3) Contain, as nearly as possible, *equal population;* and

(4) Include *whole townships,* except when a division is clearly necessary to accomplish redistricting under this section.

Ind.Code § 36–2–3–4(d) (Burns Supp.1993) (emphasis added).

Thus, the factors to consider are: contiguity, compactness, natural boundaries, precinct boundaries, township boundaries, and equal population.

**A. Contiguity:** The Plaintiffs argue that the August 23 Plan violates Indiana law because it is not contiguous. Specifically, the Plaintiffs contend that contiguity is lacking because under the August 23 Plan, the Wabash River geographically separates the southern part of District 2 (Prairieton and Prairie Creek Townships) from the northern part (Fayette, Sugar Creek, and part of Har-

rison Townships). No tunnel, ferry, or bridge traverses the Wabash River connecting the southern part of District 2 with the northern part.

The Plaintiffs' argument, however, is without merit because a district lacks contiguity only when a portion of the district is separated from the remainder of the district *by another district. See Mader v. Crowell,* 498 F.Supp. 226, 229 (M.D.Tenn.1980) (the portion of a state senate district that was separated from another by a river, with no bridge over the river in the district, was contiguous with and adjoined the remaining portion of the district).[13] "The term 'contiguous territory' has been defined as 'territory touching, adjoining and connected, as distinguished from territory separated by other territory.'" *Schneider v. Rockefeller,* 38 A.D.2d 495, 499–500, 331 N.Y.S.2d 270 (1972) (citation omitted) (state legislative reapportionment statute was valid despite division of certain districts by bodies of water). Here, District 2 is divided by the Wabash River; it is not divided by another district. The requirement of "contiguity" is not violated because water divides part of a district. *Id.* at 500, 331 N.Y.S.2d 270. Although no physical structure, such as a bridge, provides for foot or motor passage between the northern and southern parts of District 2, the Plaintiffs do not claim that the pertinent portion of the Wabash River cannot be crossed by watercraft. As the court in *Mader* noted,

A person obviously could cross the river by boat without entering another district. Plaintiffs' reading, however, requires an inference that only terrestrial, distinguished from marine, forms of transportation are intended. The court does not believe that convenience or ease of travel is an essential element of contiguity.

498 F.Supp. at 228–29.

Although the court rejects the Plaintiffs' argument that the August 23 Plan lacks con-

---

**13.** The Indiana Legislature did not define the word "contiguous" as having any special meaning. Accordingly, this court assumes that it has an ordinary meaning, such as found in *Black's Law Dictionary:* "In close proximity; neighboring; adjoining; near in succession; in actual close contact; touching at a point or along a boundary; bounded or traversed by. The term is not synonymous with 'vicinal.'" *Black's Law Dictionary* 320 (6th ed. 1990). Further, interpretations of this simple word by courts of other jurisdictions in similar contexts is also helpful to understand what it means in this enactment.

tiguity, the contiguity issue is mooted by the court's acceptance of the Plaintiffs' Plan. The Plaintiffs' Plan is superior to the August 23 Plan in this regard because it follows the natural boundary of the Wabash River. The Plaintiffs' Plan draws the border between District 2 and District 4 along the River, resulting in no district being divided by the River. The court further concludes that the Plaintiffs' Plan is superior in terms of contiguity because trial testimony indicated that the Commissioners did not even consider the contiguity-of-districts requirement when they formulated the August 23 Plan. Such failure of the Commissioners to consider a key element of the statutory requirement indicates a failure to make a good faith effort to create lawful districts.

**B. Compactness:** The shorter the length of internal boundary lines between districts, the more compact the districts are. Thus, the measure of internal boundary lines is an accurate measure of compactness. The Plaintiffs' Plan has 40.88 miles of internal district boundaries. The August 23 Plan has 53.52 miles (12.64 miles longer than the Plaintiffs' Plan), making the August 23 Plan 31% larger in internal district boundaries. Thus, the Plaintiffs' Plan is superior to the August 23 Plan in terms of compactness. Additionally, the Plaintiffs' Plan is more visually compact, with districts more nearly square in shape and with straighter boundary lines. Further, the record does not reflect that the Commissioners made a good faith effort to make the districts as compact as possible. Indeed, Vigo County Commissioner James Adams testified that he could not recall any efforts by the Commissioners to make the districts compact.

Likewise, the Plaintiffs' Plan is superior with regard to following natural boundaries, particularly in following the Wabash River as a boundary between District 2 and District 4. In contrast, the August 23 plan does not follow the Wabash River boundary between Sugar Creek and Prairieton Townships.

**C. Precinct Boundaries:** The Plaintiffs' Plan and the August 23 Plan are equal with respect to precinct boundaries. Neither plan divides any precincts.

**D. Township Boundaries:** The Plaintiffs' Plan and the August 23 Plan are equal with respect to township boundaries. Both plans leave all township boundaries intact except for Harrison Township, which must be subdivided due to its large population.

**E. Population Deviation:** The August 23 Plan has a total population deviation of 3.8%, which is almost ten times greater than the Plaintiffs' Plan with a total deviation of only .41%. Thus, the Plaintiffs' Plan is superior to the August 23 Plan in terms of population deviation.

In sum, the August Plan violates state-law requirements because the districts are not reasonably compact and are not as equal in population as possible. In contrast, the Plaintiffs' Plan is equal to or superior to the August 23 Plan and fully complies with the applicable requirements of federal and state law.

## IV. CONCLUSION

The Commissioners' August 23 plan violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Indiana Code § 36–2–3–4 for failing to construct districts with as equal population as possible and for failing to have reasonably compact districts. The districts in the Plaintiffs' Plan are closer in population and are more compact than those in the Commissioners' August 23 Plan. Other significant deficiencies exist in the August 23 Plan with regard to three key governmental interests specified in the Indiana statute: the requirements that the districts be contiguous, Ind.Code § 36–2–3–4(a), and follow natural boundaries. Ind.Code § 36–2–3–4(d)(1) (Burns Supp.1993). In contrast, the districts in the Plaintiffs' Plan are not separated by the Wabash River, and the Plaintiffs' Plan follows the dominating natural boundary of the Wabash River in areas where following it is essential.

In view of the above conclusions, the motion to dismiss and motion for judgment on the evidence made by the Commissioners at trial are hereby DENIED.

Due to the apparent refusal or inability of the Commissioners to adopt, in good faith, a

lawful redistricting plan, and due to the necessity of having a lawful plan in place prior to December 31, 1993, the Court will order the adoption of the Plaintiffs' Plan as the redistricting plan for Vigo County Council districts for purposes of the 1994 councilmember election. A judgment to that effect in favor of the Plaintiffs on both counts will be issued along with this entry. Further, as the "prevailing parties" on Count I, the Plaintiffs are entitled to an award of costs and attorney fees. 42 U.S.C.A. § 1988 (West 1982).

## JUDGMENT

For the reasons set forth in the entry in this cause issued this same date, Judgment is entered in favor of the Plaintiffs and against the Defendants on both counts of the complaint. Further, the Commissioners of Vigo County Indiana are ORDERED to adopt the Plaintiffs' Plan as the district map for the Vigo County Council districts for the November 1994 election. Specifically, the Commissioners' districts shall be divided as follows:

DISTRICT 1
  NEVINS TOWNSHIP
  LOST CREEK TOWNSHIP
  OTTER CREEK TOWNSHIP
  HARRISON TOWNSHIP PRECINCTS
        6-A    6-E
        6-B    7-I
        6-C    7-J
        6-D
DISTRICT 2
  FAYETTE TOWNSHIP
  SUGAR CREEK TOWNSHIP
  HARRISON TOWNSHIP PRECINCTS
        1-A    1-H    5-C
        1-C    2-C    5-D
        1-D    2-E    5-H
        1-F    5-A    5-I
        1-G    5-B
DISTRICT 3
  HARRISON TOWNSHIP PRECINCTS
        2-B    3-G    4-B    7-A    7-G
        2-F    3-H    4-D    7-B    7-K
        3-B    3-I    4-F    7-C    8-A
        3-C    3-J    4-G    7-D    8-B
        3-E    3-K    5-G    7-E    8-C
        3-F    4-A    6-F    7-F    8-H
DISTRICT 4
  RILEY TOWNSHIP
  PIERSON TOWNSHIP
  HONEY CREEK TOWNSHIP
  LINTON TOWNSHIP
  PRAIRIETON TOWNSHIP
  PRAIRIE CREEK TOWNSHIP
  HARRISON TOWNSHIP PRECINCTS
        2-H    8-E
        2-I    8-F
        2-J    8-I
        8-D

Finally, the Plaintiffs' costs and attorney fees shall be assessed against the Defendants, and the Plaintiffs have thirty days from the date of this Judgment to file their bill of costs and petition for attorney fees. The Defendants will have fifteen days to respond, and the Plaintiffs will have seven days to reply.

This Judgment is final immediately, and the determination of the amount of the fees and costs which still remains to be done shall not delay the finality of the matters determined herein.